IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:10-CR-15-FL

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v. )<br>)<br>FREEDMAN FARMS, INC., )<br>and WILLIAM BARRY FREEDMAN, )<br>)<br>Defendants. ) | **NOTICE** |

In this matter, the parties filed trial briefs detailing governing issues of law that determine, among other things, the government's jurisdiction to prosecute defendants. It appeared to the undersigned that an expedited deadline for certain proposed jury instructions would help frame the issues and aid the court and parties in trial preparation. The parties then were ordered to submit proposed jury instructions on those issues of law contained in the parties' trial briefs by January 24, 2011. The court having received and reviewed these proposed instructions, notices preliminary determination to instruct the jury on what constitutes a "water of the United States," with deference to the "significant nexus" test, deemed controlling for wetlands adjacent to non-navigable tributaries of traditionally navigable waters, for reasons that follow.[1]

**STATEMENT OF THE CASE**

This case involves an individual defendant and a corporate defendant. Freedman Farms, Inc. is a North Carolina corporation that operates a hog and crop farm business with sites located in several counties. The farm site at issue in this case is located in Columbus County ("the farm"). William Barry Freedman ("Barry Freedman") is the principal operator of Freedman Farms.

The grand jury returned a four-count indictment against defendants on February 4, 2010. The

---

[1] Said determination is preliminary and not final. The parties shall have other and further opportunity during the course of trial to engage in conference with the court concerning the court's charge. Should cause be shown as to why this instruction should be changed, the court will make the necessary adjustments.

charges arise out of the alleged discharge of hog waste into Browder's Branch, a stream of some sort that runs through the farm. Count One charges defendants with a knowing violation of the Clean Water Act, in violation of 33 U.S.C. §§ 1311 and 1319.[2] Defendants plead not guilty.

## COURT'S ANALYSIS

A.  The Clean Water Act

Congress passed the Clean Water Act ("the Act") in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Act prohibits the discharge of pollutants into navigable waters except as in compliance with the Act's provisions. See 33 U.S.C. § 1311(a) (prohibiting the discharge of any pollutant); § 1362(12)(A) (defining "discharge of a pollutant" as the addition of a pollutant into navigable waters). The Act defines "navigable waters" as "waters of the United States, including the territorial seas." § 1362(7).

Thus, jurisdiction exists only where pollutants are discharged into a "water of the United States." The term "waters of the United States" encompasses more than traditionally navigable waters. Indeed, the term is defined by the United States Army Corps of Engineers regulations to include not only actually navigable waters but also tributaries of such waters as well as adjacent wetlands. See 33 CFR § 328.3(a).[3] The regulations specify that "adjacent" means "bordering,

---

[2] Counts Two, Three and Four are not pertinent to the issues herein considered. Counts Two and Three charge the defendants with making False Statements in violation of 18 U.S.C. § 1001(a)(2) and (3), and aiding and abetting. Count Four charges defendants with Obstruction in violation of 18 U.S.C. § 1503, and aiding and abetting.

[3] "Waters of the United States" is defined fully to include:
> (1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
> (2) All interstate waters including interstate wetlands;
> (3) All other waters such as intrastate lakes, streams (including intermittent streams)... wetlands ... or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:
>> (i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or
>> (ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or
>> (iii) Which are used or could be used for industrial purpose by industries in

contiguous, or neighboring," and that wetlands are "adjacent" even if separated from other waters by man-made dikes or barriers, natural river berms, beach dunes and the like. 33 CFR § 328.3(c).

B.    Supreme Court Jurisprudence

The parameters of jurisdiction under the Act has been examined in three major Supreme Court cases.

    1.    Pre-<u>Rapanos</u> Decisions

The Supreme Court first interpreted the phrase "waters of the United States" in <u>United States v. Riverside Bayview Homes, Inc.</u> 474 U.S. 121 (1985). That case involved a wetland that extended beyond the boundary of the respondent's property to a navigable waterway. <u>Id.</u> at 131. Noting that "the transition from water to solid ground is not necessarily or even typically an abrupt one," and that there is necessarily some difficulty in determining where the water ends and the land begins, the Court upheld the Corps' interpretation of "waters of the United States" to include wetlands that "actually abut on" traditional navigable waters. <u>Id.</u> at 135.

Following the Court's decision in <u>Riverside Bayview</u>, the Corps adopted increasingly broad interpretations of its regulations. In <u>Solid Waste Agency of Northern Cook County v. Army Corps of Engineers</u> ("SWANCC"), the Court examined the Corps' so-called "Migratory Bird Rule," which purported to extend jurisdiction under the Act to any intrastate waters "which are or could be used as a habitat" by migratory birds. 531 U.S. 159, 163-64 (2001). In that case, the Corps applied the Migratory Bird Rule to regulate an abandoned sand and gravel pit in northern Illinois. <u>Id.</u> at 162. The Court determined that the Corps had gone too far, observing that "it was the *significant nexus*

---

        interstate commerce;
    (4) All impoundments of waters otherwise defined as waters of the United States;
    (5) Tributaries of waters identified in paragraphs (1) through (4);
    (6) The territorial seas;
    (7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified
    in paragraphs (1) through (6).
33 CFR § 328.3(a).

between the wetlands and 'navigable waters' that informed our reading of the CWA in Riverside Bayview." Id. at 167. The Court held that non-navigable, isolated, intrastate waters which did not actually abut on a navigable waterway were not included as "waters of the United States." Id.

2. Rapanos v. United States

In Rapanos v. United States, 547 U.S. 715 (2006), which involved two consolidated cases, the Supreme Court delivered its most recent interpretation of "waters of the United States," this time in the context of adjacent wetlands. The cases involved four separate wetlands, all near ditches or man-made drains that eventually emptied into traditional navigable waters. In both cases, the Sixth Circuit concluded that the wetlands were covered by the Act. Id. at 729-30. The Supreme Court consolidated the cases and granted certiorari to decide whether the wetlands actually constituted "waters of the United States" under the Act. The Supreme Court vacated the Sixth Circuit and remanded the cases for reconsideration in light of the appropriate legal standard. Id. at 757.

The Court itself, however, could not agree on the appropriate legal standard, and issued a split decision. Although there are five written opinions which make up the Rapanos decision, the three major opinions are: (1) the plurality opinion authored by Justice Scalia and joined by Justices Thomas, Alito, and the Chief Justice; (2) Justice Kennedy's concurring opinion; and (3) the dissenting opinion authored by Justice Stevens and joined by Justices Souter, Ginsburg, and Breyer.

a. The Plurality Opinion

Justice Scalia in writing for the plurality advocated a newly restrictive approach to jurisdictional determinations under the Act. Under the plurality's approach:

> The phrase "the waters of the United States" includes only those relatively permanent, standing or continuously flowing bodies of water "forming geographic features" that are described in ordinary parlance as "streams, oceans, rivers, and lakes." The phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall.

Id. at 739 (internal citations omitted). The plurality explained, however, that "[b]y describing 'waters' as 'relatively permanent,' we do not necessarily exclude streams, rivers, or lakes that might dry up in extraordinary circumstances, such as drought. We also do not necessarily exclude *seasonal* rivers, which contain continuous flow during some months of the year but no flow during dry months." Id. at 733, n. 5.

Further, the plurality addressed the circumstances under which a wetland may be considered "adjacent to" waters of the United States, concluding that:

> [O]nly those wetlands with a continuous surface connection to bodies that are "waters of the United States" in their own right, so that there is no clear demarcation between "waters" and wetlands, are "adjacent to" such waters and covered by the Act. Wetlands with only an intermittent, physically remote hydrologic connection to "waters of the United States" do not implicate the boundary-drawing problem of Riverside Bayview, and thus lack the necessary connection to covered waters that we described as a "significant nexus" in SWANCC.

Id. at 742.

Therefore in sum, under the plurality's approach, establishing that wetlands are covered by the Act requires two findings. Id. First, the adjacent channel must itself contain a water of the United States (i.e., a relatively permanent body of water connected to traditional interstate navigable waters). Id. Second, the wetland must have a continuous surface connection with that water, making it difficult to determine where the "water" ends and the "wetland" begins. Id.

### b. Justice Kennedy's Concurring Opinion and "Significant Nexus" Test

Justice Kennedy concurred in the plurality's decision to remand the case. Id. at 759. He advocated, however, an entirely different approach for establishing whether wetlands come within the Corps' jurisdiction under the Act:

> [T]he Corps' jurisdiction over wetlands depends upon the existence of a significant nexus between the wetlands in question and navigable waters in the traditional sense . . . wetlands possess the requisite nexus, and thus come within the statutory phrase "navigable waters," if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological

integrity of other covered waters more readily understood as "navigable." When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term "navigable waters."

Id. at 779-80.

Justice Kennedy found the plurality's approach too limiting of the Corps' jurisdiction, identifying two limitations which the plurality proposed with which he disagreed. First, he disagreed with the plurality's conclusion that the phrase "navigable waters" includes only "relatively permanent, standing or flowing bodies of water." Id. at 768-69. Justice Kennedy found that this limitation made little sense in view of Congress' concern with downstream water quality, and that jurisdiction should exist where intermittent water flow impacts downstream water quality, even if the flow of water is not relatively permanent. Id. at 769. Second, Justice Kennedy disagreed with the plurality's assertion that wetlands fall within the Act only if they bear a "continuous surface connection" to bodies that are waters of the United States in their own right. Id.

    c. Justice Stevens' Dissenting Opinion

The four dissenting justices would have upheld the broad interpretation of jurisdiction under the Act and concluded that the wetlands at issue were "waters of the United States." Id. at 810. Justice Stevens then observed that although the plurality and Justice Kennedy agreed that remand was appropriate, their opinions set forth different tests for the appropriate test to apply on remand. Id. He then concluded that, because all four dissenting justices would have upheld jurisdiction where either the plurality's or Justice Kennedy's tests were satisfied, jurisdiction should in the future be upheld if *either* of those tests is satisfied. Id.

C. The Governing Rule of Rapanos

The circuits are split on the question of which Rapanos opinion provides the holding. The Seventh, Ninth, and Eleventh Circuits have held that Justice Kennedy's "significant nexus" test alone is controlling. See United States v. Robison, 505 F.3d 1208, 1221 (11th Cir. 2007); Northern

California River Watch v. City of Healdsburg, 496 F.3d 993, 999-1000 (9th Cir. 2007); United States v. Gerke Excavating, Inc., 464 F.3d 723, 724-25 (7th Cir. 2006), *cert denied* 522 U.S. 810 (Oct. 1, 2007).

The First Circuit, on the other hand, has adopted the dissenting justices' view that jurisdiction exists where either the plurality's test or Justice Kennedy's test is met. United States v. Johnson, 467 F.3d 56, 64 (1st Cir. 2006), *cert denied* 522 U.S. 948 (Oct. 9, 2007).

The Fourth Circuit has not explicitly analyzed the issue. However, in a published opinion released on January 25, 2011, the Fourth Circuit acknowledged the two competing tests, but stated that "[t]he parties here agree that Justice Kennedy's 'significant nexus' test governs . . . whether the Corps has jurisdiction over the Site Wetlands." Precon Development Corporation, Inc. v. U.S. Army Corps of Engineers, ___ F.3d ___, 2011 WL 213052, *8 (4th Cir., Jan. 25, 2011). The Fourth Circuit then stated without any analysis that "the significant nexus undisputedly controls," and continued with its analysis of the case. Id.

The Fourth Circuit's decision to apply the significant nexus test in Precon, while devoid of reasoning, suggests the Fourth Circuit would affirm application of that test. Therefore, for purposes of jury instructions on what constitutes a "water of the United States," the "significant nexus" test is deemed controlling for wetlands adjacent to non-navigable tributaries of traditionally navigable waters.

## JURY INSTRUCTIONS ON "WATER OF THE UNITED STATES"

A. Application to Freedman Farms

The "water" at issue in Freedman Farms is Browder's Branch. In order for the government to establish jurisdiction, it must show that Browder's Branch is a "water of the United States" under the Act. This issue is a question for the jury. See Robison, 505 F.3d at 1224, n. 21 (noting that whether a water is a "water of the United States" is a "question for the jury in the first instance").

Browder's Branch is, of course, characterized differently by the government and the defendants in their trial briefs. The government describes Browder's Branch as a "perennial tributary" which runs southeast through the farm in a southeasterly direction, eventually forming part of a large wetlands complex that stretches to the Waccamaw River. (DE #87, p. 17-18) Defendants characterize Browder's Branch as "a ditch, dry for much of the year, that runs into a swamp, which itself is many miles from any navigable in fact waterway." (DE #86, p. 6)

B.  Jury Instructions on "Water of the United States"

The parties have submitted proposed jury instructions on the "Water of the United States" element for Count One.[4]

The court notices herein that it is not inclined to adopt either the government's or the defendants' instruction on "Water of the United States." The government suggests both the plurality's test and the significant nexus test, which is inappropriate. The defendants' correctly endorses only the significant nexus test, but the instruction is not correctly framed. The defendants use the instruction as a preliminary jurisdictional finding, to be administered before delivering the individual elements. In this regard, the government's approach which delivers the instruction in the form of a definition after the individual elements have been set forth is adopted. After reviewing the proposed jury instructions for this element and the relevant case law, the court notices intent to instruct in part as follows:

> *"Waters of the United States" Defined*
>
> *As I previously explained, one of the elements that the Government must prove beyond a reasonable doubt is that Browder's Branch constitutes a "water of the United States." The phrase "waters of the United States" has a special and specific*

---

[4] The government submitted all of its proposed jury instructions, including the elements and definitions required for Count One. The defendants have only submitted their proposed instruction for "Water of the United States."

*meaning under the Clean Water Act.*

*The phrase "waters of the United States" includes traditionally navigable waters and their tributaries.*

*The phrase "waters of the United States" also includes certain wetlands that are adjacent to traditionally navigable waters or their tributaries. Wetlands constitute "waters of the United States" <u>only</u> where a significant nexus exists between the wetlands in question and navigable waters in the traditional sense. Wetlands possess the requisite nexus if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as navigable. If a wetlands' effects on water quality are speculative or insubstantial, then a significant nexus does not exist.*

<u>Authority</u>: <u>Rapanos v. United States</u>, 547 U.S. 715 (2006) (concurring opinion of Kennedy, J.); <u>Precon Development Corp., Inc. v. U.S. Army Corps of Engineers</u>, ___ F.3d ___, 2011 WL 213052 (4th Cir., Jan. 25, 2011).

SO NOTICED, this the 17th day of February, 2011.

                                             LOUISE W. FLANAGAN
                                             Chief United States District Judge